PEOPLE v. HUNTER.

1. TRIAL—REQUEST TO CHARGE—INSTRUCTIONS.

A request to charge becomes the instruction of the court when given and should not be given to the jury as emanating from either party to the case, either criminal or civil.

2. HOMICIDE—SELF-DEFENSE—INSTRUCTIONS.

An instruction in prosecution for murder in the first degree that plea of self-defense was not available to appellant if a second male defendant were not present held, prejudicial, where the presence or absence of such other defendant was not of pivotal importance to appellant's plea of self-defense because of alleged attack upon him by the victim with a pistol in his hand (CL 1948, § 750.316).

3. WITNESSES—CREDIBILITY—CORROBORATION.

A jury which finds that a witness has deliberately testified falsely on a material point in the case may properly disregard the entire testimony of that witness except such testimony as it believed worthy of belief or which may have been corroborated by other reliable witnesses.

4. HOMICIDE—INSTRUCTION—WITNESSES—CREDIBILITY.

Instruction that if jury did not believe appellant's testimony that a male codefendant was not present at time of alleged assault upon victim by defendant, that jury could not believe the balance of appellant's testimony under any circumstances held, prejudicial in prosecution for murder (CL 1948, § 750-.316).

REFERENCES FOR POINTS IN HEADNOTES

[1] 53 Am Jur, Trial § 538.
[2] 26 Am Jur, Homicide § 548.
[3] 58 Am Jur, Witnesses § 872.
    Modern view as to propriety and correctness of instructions referable to maxim "falsus in uno, falsus in omnibus." 4 ALR2d 1077.
[4] 26 Am Jur, Homicide §§ 520, 521.
[5] 53 Am Jur, Trial § 899.

5. TRIAL—JURY'S CONSIDERATION OF EVIDENCE—ARGUMENT TO JURY—INSTRUCTIONS.

> Due process of law in the jury trial of a case requires that the trial court's preliminary admonition as to jurors' conduct during the course of what is expected to be a protracted trial be that they not discuss the evidence among themselves until all of the evidence has been introduced, the arguments to the jury made, and the jury charged by the court, since to permit the jurors to have previous discussion of the evidence among themselves would lead to effecting a shift in the burden of proof and a failure upon the part of individual jurors to weigh the evidence or argument fairly.

Appeal from Recorder's Court of Detroit; Gillis (Joseph A.), J. Submitted February 5, 1963. (Calendar No. 45, Docket No. 49,771.) Decided May 9, 1963.

Ralph Ray Hunter was convicted of murder in the first degree. Reversed and remanded for new trial.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *Samuel H. Olsen,* Prosecuting Attorney, and *Samuel J. Torina,* Assistant Prosecuting Attorney, for the people.

*Grossman, Hyman & Grossman (Carl Levin,* of counsel), for defendant.

*Amicus Curiae:*

*Rolland R. O'Hare* and *Erwin Ellmann (Fay A. O'Hare,* of counsel), for American Civil Liberties Union of Michigan.

SOURIS, J. Defendant appeals from his jury conviction of murder in the first degree. His principal claim of reversible error is that the trial judge's charge to the jury improperly deprived him of jury consideration of his defense of self-defense.

Defendant Hunter was tried together with a male codefendant, James Sacchetti, and defendant Evelyn Lari, Hunter's girl friend, for the murder of Elmer Jones. Hunter claimed at the trial that he killed Jones in self-defense when Jones aimed a revolver at him during the course of an altercation while he and Miss Lari were visiting Jones in his home. Miss Lari, although a codefendant, testified at the trial that defendant Sacchetti was also present at the time of Jones' murder. The pertinent details of the testimonial record made at the trial are fairly summarized in that portion of the trial judge's charge to the jury in which he sets forth Hunter's theory of the case:

"Defendant Hunter, upon going to the room, found that the defendant Lari had not checked out, *  *  * that she said she would be good, that she asked why couldn't they be like they used to be and have the same parties like they used to have; that he weakened and told her very well, they would have 1 more night, spend 1 more night together and then she would leave and go out of his life forever; that he was going to go to a nearby drinking establishment, but she said she wanted to go to the east side to talk to a friend; that they drove out to Ashland avenue to the home of Mr. Jones around 12 o'clock; that Jones came to the door in his night clothing, saw who they were, returned to his bedroom, put on trousers and hugged and greeted Evelyn; that Jones and Evelyn Lari had some conversation, that defendant Lari then introduced him under his right name, that he tried to be friendly with Jones and started to shake hands, but Jones suddenly became unfriendly, repulsed him, and stated, 'You are the man who is taking my little girl from me,' or words to that effect; that defendant Hunter said he did not want her, that he was bringing her back and suggested they be friendly; that Jones and the defendant Lari went into his bedroom; that he would have left except defendant Lari

said she wished to return with him and told him to wait a minute; that after waiting a few minutes he told them to hurry up; that after a lapse of several minutes he heard defendant Lari say the words, 'not now', or in substance, that he entered the bedroom and found the deceased Jones committing an act of perversion upon the defendant Lari, that he became incensed and grabbed Jones and tossed him in the corner; that the room was dimly lit, but that Jones came after him again and a fight ensued; then, for the first time he noticed the deceased Jones had a Luger pistol in his hand; that he attempted to pacify him; that Jones stated that he took his girl once and would never take her again; that he would not leave the room alive, or words to that effect; that he warned the defendant Lari not to disturb Jones, and told him not to shoot, that he told him that he could have the girl; and that, realizing then he was going to be killed, that his life was in danger, that he attempted to grab the gun from Jones; that a struggle ensued, that Jones was strong and put up great resistance, that he had to bang his head against the bulkhead, or wall; and finally succeeded in breaking Jones' grip upon the gun after he had shifted from the right to the left hand; that he picked [the] gun up, took the clip out, and later Jones attacked him again and grabbed him by his privates; that it then became necessary for him to take the gun and strike Jones over the head and then to choke him into unconsciousness; that he subsequently tied him up with neckties and after he was tied up noticed the ring on Jones' finger, and because he was mad at Jones or 'as a gesture', as he put it, he took the ring and he also kept the gun; that [he] attempted to wash the blood stains from his clothing and because of the blood on his trousers and shirt he removed them and put on the trousers and clothing belonging to Jones; that he and Evelyn then left and walked to Jefferson avenue, took a cab back to the hotel; * * * that Jones was hostile to him because of Hunter's having taken his girl; that Jones assaulted him; that the

only recourse left to him was to strike Jones and protect himself; that he was fearful of death or great bodily harm; that all his acts were in self-defense; and therefore he is not guilty of the charge.

"That is the theory of the defendant Hunter, as I understand it. I have gone over it fast   *   *   * but I think all [the details] have been mentioned."

Having fairly stated defendant Hunter's theory of the case, as well as the theories of his codefendants and the prosecution, the trial judge then properly instructed the jury on the legal requirements of the defense of self-defense. At the conclusion of what may be described as an excellent formal charge to the jury, the judge then undertook to read to the jury certain of the requests to charge made by the parties, many of which were repetitious, and otherwise thoroughly covered in the court's formal charge. Included among the charges requested by the prosecution which the trial judge unfortunately gave to the jury is the following:

"The prosecuting attorney has given me some requests to charge, members of the jury.

"I charge you that self-defense is defensive and not an offensive act, and must not exceed bounds of mere defense and prevention. Acts constituting self-defense by accused, depend primarily on his own conduct and secondarily upon decedent's conduct.

"I will give you request No. 1, members of the jury: In justification of the offense here charged against him, the respondent Hunter has interposed a plea of self-defense and under certain circumstances that is a good defense. In order to give any consideration to Hunter's plea of self-defense it will first be necessary for you to conclude that Sacchetti was not at the scene on the fatal night of the assault upon Jones, because if you disbelieve Hunter's and Sacchetti's testimony that Sacchetti was not in the home of the deceased at the time Hunter assaulted

Jones, then Hunter's plea of self-defense fails and you have no right to consider it. Hunter's plea of self-defense is based upon the theory that Mrs. Lari alone visited Mr. Jones on the fatal evening. That Jones first assaulted Hunter and that the affray was between Jones and Hunter only, and that Sacchetti was not there. The defense is based upon Sacchetti's absence from the scene. So, if you give credence to Mrs. Lari's testimony that Sacchetti was with Hunter and her and that all 3 were at the home of the deceased on that fatal evening, then you must totally disregard Hunter's plea of self-defense. On the other hand, if you disbelieve Mrs. Lari's testimony and believe Hunter's and Sacchetti's testimony on this point, then you are entitled to give Hunter's plea of self-defense consideration. To recapitulate, if you believe Hunter's and Sacchetti's testimony on the point of Sacchetti's absence from the home of Jones on the fatal night, then you may consider Hunter's plea of self-defense. On the other hand, if you disbelieve Hunter's and Sacchetti's testimony on this point and believe Mrs. Lari's testimony that Sacchetti was there on that fatal evening, you are hereby instructed to totally disregard Hunter's plea of self-defense."

We cannot read the immediately preceding charge requested by the prosecution as other than prejudically erroneous.* In that single instruction, given to the jury immediately before it retired to deliberate upon its verdict, the jury was told that if it believed defendant Lari's testimony that Sacchetti was present at the time of the murder, the jury could not give any consideration to defendant

---

* We note, in passing, the trial judge's labeling of the requested instructions given to the jury as emanating from the prosecutor. We have had occasion recently to indicate our disapproval of this improper practice in civil cases. See *Reetz* v. *Rigg,* 367 Mich 35, relying upon *Newton* v. *Consolidated Construction Co.,* 184 Mich 63. It is no less improper in criminal cases. When requested instructions are adopted by the court, they are the court's instructions,—not requested instructions.

Hunter's defense of self-defense,—not that it need not find, under such circumstances, that Hunter acted in self-defense, but that it *could not* properly find that his actions were in his own self-defense. Contrary to the trial judge's belief, as expressed by him in his opinion denying motion for new trial, Sacchetti's presence or absence was not of pivotal importance to Hunter's plea of self-defense. According to Hunter's theory of the case, even as stated to the jury by the trial judge himself, Hunter was placed in mortal fear for his life when Jones attacked Hunter with a Luger pistol in his hand. Even had Sacchetti been present at that time, we are not prepared to say that as a matter of law the jury could not have found that Hunter acted in self-defense. It was for the jury to determine to what extent the Luger equalized the combat between 72-year-old Jones and 25-year-old Hunter aided or unaided by the presence of Sacchetti.

Another interesting aspect of the trial judge's challenged instruction is the violence it does to our commonly used instruction to juries on the issue of witnesses' credibility. As a matter of fact, the trial judge quite properly instructed the jury in this case that if it found that a witness had testified falsely, and deliberately so, on a material point in the case, it could disregard the entire testimony of that witness except such testimony that it believed worthy of belief or which may have been corroborated by other reliable witnesses. See *People* v. *Jones,* 336 Mich 617, 628, quoting with approval from *People* v. *Paremba,* 240 Mich 489. By the challenged instruction, however, the judge told the jury in effect that if it did not believe Hunter's testimony that Sacchetti was not present at the scene of the crime, the jury could not believe the balance of Hunter's testimony under any circumstances.

While the erroneous instruction discussed above is sufficiently prejudicial in our view to require reversal and remand, we deem it appropriate to comment on 1 other aspect of this case. At the commencement of the trial the trial judge gave to the jury general instructions with reference to their conduct during the course of what was expected to be a protracted trial. In the course of doing so he said the following:

"I might say, in discussing that, members of the jury, the proper way, as you go along, you may discuss among yourselves testimony and so forth, but do not arrive at a verdict, do not attempt to arrive at a verdict."

It seems to us clear beyond any doubt that jurors should not be encouraged to discuss evidence they have heard and seen during the course of trial until all of the evidence has been introduced, the arguments to the jury made, and the jury charged by the court but that, rather, juries should be directed by the court not to do so until ready to deliberate upon their verdict at the conclusion of the trial. This matter has been fully and carefully considered by the circuit court of appeals for the eighth circuit in *Winebrenner* v. *United States,* 147 F2d 322. We quote therefrom, with approval (pp 327–329):

"Whether guilty or innocent, appellants were entitled under the Fifth and Sixth Amendments to the Constitution to a fair trial to an impartial jury. Here the court not only declined to admonish the jury that they should not discuss the case among themselves, nor form nor express an opinion as to the guilt or innocence of the defendant until the case had finally been submitted to them, but the jury was in effect advised that the jurors might discuss the case among themselves if careful not to make up their minds finally and definitely about it. Again the court said:

" 'The result that is sought to be accomplished is that you not discuss the case before you to such an extent that you form definite fixed ideas *that would prevent you from changing after you had heard all of the evidence in the case.'*

"Jurors are chosen from every conceivable walk in life. The butcher, the baker, the merchant, the taxi driver, the day laborer, the farmer, the mechanic, the accountant, the barber, the hotel clerk, the cobbler, and the gas station attendant may make up the jury in a criminal case, but however it may be composed it must be borne in mind that the jurors are unschooled and inexperienced as to their duties in a criminal case, and they are not instructed as to those duties until all the evidence has been received, except as the court may in his admonition give them advice on their functions and how they are to be performed, and particularly as to how they should demean themselves; hence, the importance of this admonition. Without admonition their course is uncharted. Thus, it is not until the final submission of the case that the jurors are told that a defendant is under the law presumed to be innocent and not guilty and that that presumption attends him throughout the trial, so that it is incumbent upon the government to prove the guilt of the defendant beyond a reasonable doubt. These instructions are deemed of vital importance as fixing the standards to be followed by the jury in determining the guilt or innocence of a defendant. If, however, the jurors may discuss the case among themselves, either in groups of less than the entire jury, or with the entire jury, they are giving premature consideration to the evidence. By due process of law is meant 'a law which hears before it condemns; which proceeds upon inquiry, and renders judgment only after trial.' The jury should not discuss the case among themselves because, first, they have not heard all of the evidence; second, they have not heard the instructions of the court as to how this evidence is to be considered by

them, and neither have they heard the arguments of counsel. * * *

"Under the court's admonition the jurors were warranted as a result of discussion among themselves, either in small groups or large ones, to form opinions so long as such opinions were not so absolutely fixed that they would 'prevent you from changing after you had heard all of the evidence in the case.' Such an opinion of necessity could result from a discussion of only a part of the evidence, the evidence not having all been submitted. Such an opinion once formed could only be removed, if at all, by evidence. This in effect shifted the burden of proof and placed upon the defendants the burden of changing by evidence the opinion thus formed. A juror having in discussion not only formed but expressed his view as to the guilt or innocence of the defendant, his inclination thereafter would be to give special attention to such testimony as to his mind strengthened, confirmed or vindicated the views which he had already expressed to his fellow jurors, whereas, had there been no discussion and no expression of tentative opinion, he would not be confronted with embarrassment before his fellow jurors should he change the tentative opinion which he might entertain from hearing evidence. Chief Justice Marshall in the notable trial of *United States* v. *Aaron Burr* (CC Va) 25 Fed Cas, No 14,692g, speaking on the qualifications of a juror who may have heard the testimony at a former trial, said (p 50):

" 'Such a person may believe that he will be regulated by testimony, but the law suspects him, and certainly not without reason. He will listen with more favor to that testimony which confirms, than to that which would change his opinion; it is not to be expected that he will weigh evidence or argument as fairly as a man whose judgment is not made up in the case.'

"In the instant case, under the court's admonition, the juror may well have formed and expressed to

his fellow jurors an opinion. The same thought is expressed by Circuit Judge Love in *Pool* v. *Chicago B. & Q. R. Co.* (CC Iowa), 6 F 844, 850, where it is said:

" 'There is no right more sacred than the right to a fair trial. There is no wrong more grievous than the negation of that right. An unfair trial adds a deadly pang to the bitterness of defeat.

" 'Now, the human mind is constituted so that what one himself publicly declares touching any controversy is much more potent in biasing his judgment and confirming his predilections than similar declarations which he may hear uttered by other persons. When most men commit themselves publicly to any fact, theory, or judgment they are too apt to stand by their own public declarations, in defiance of evidence. This pride of opinion and of consistency belongs to human nature.'

"In *Patton* v. *United States,* 281 US 276, 312, 313 (50 S Ct 253, 263, 74 L ed 854, 70 ALR 263); speaking of the obligation of the trial court to preserve the right of the accused to trial by jury, the supreme court speaking through Mr. Justice Sutherland, said that such duty 'is not to be discharged as a mere matter of rote, but with sound and advised discretion, with an eye to avoid unreasonable or undue departures from that mode of trial or from any of the essential elements thereof, and with a caution increasing in degree as the offenses dealt with increase in gravity.'

"The solicitude of courts that jurors remain open minded to a consideration of the entire case, rather than opinionated and impervious to fair debate and decision, is demonstrated by instructions to them after prolonged deadlock, which urge each juror 'to get into his mind what his colleagues have to say before arriving at his final decision and then be guided by his own judgment.' *United States* v. *McGuire* (CCA 2), 64 F2d 485; *Boehm* v. *United States* (CCA 8), 123 F2d 791. * * *

"Defendants were entitled to have their case considered by all the jurors as a jury. Here, without

instructions as to the law, without hearing all the testimony, and without hearing argument of counsel, they were authorized to divide themselves into separate groups and distinct deliberative bodies. So general is the rule that jurors should not discuss a case prior to its submission to them, that it has been enacted into statute in practically all the States of the Union. Of course, the local State statute can have no bearing on the question of procedure in a criminal case tried in Federal court, but the fact that such statutes have so generally been adopted is significant as indicating the generally accepted principle that it is improper for jurors to discuss a case prior to its submission to them. The State statutes are but codification of the common-law practice that has prevailed as a part of our jurisprudence for more than a century and a half. Thus, in *Shippy* v. *Peninsula Rapid Transit Co.,* 197 Cal 290, 294 (240 P 785, 787), that court said:

" 'It is the long-established right of both of the parties thereto to have an opportunity to argue the cause and to have the jury after such argument instructed by the judge of the court as to the law of the case; and it was equally the duty of the jury under the admonition of the court not to form or express an opinion with respect to the merits of either the facts or the law of the case until the case should be finally submitted to them.'

"And the district court of appeal of California in *Smith* v. *Brown,* 102 Cal App 477, 484 (283 P 132, 134), said:

" 'It is of course improper for jurors to discuss a case prior to its submission to them.'

"Diligent counsel for the government have not been able to call to our attention any precedent which in principle sustains the admonition as given in this case, and our research has discovered none."

Reversed and remanded for new trial.

CARR, C. J., and DETHMERS, KELLY, BLACK, KAVANAGH, SMITH, and O'HARA, JJ., concurred.